FILED

2015 Apr-09  PM 02:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL STANCOMBE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:13-cv-1134-AKK** |
| **NEW PROCESS STEEL, LP, LLC,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Michael Stancombe alleges that his former coworker, Defendant Roderick Woodfin, sexually harassed him by grabbing his buttocks on one occasion, and making pelvic thrusting motions against his body two days later. Immediately after the second incident, Stancombe quit his job at New Process Steel, where he had worked as a temporary employee for about one month. Based on Woodfin's conduct, Stancombe brings claims under Alabama law against Woodfin for invasion of privacy, outrage, and assault and battery. Doc. 1. Stancombe also alleges that Defendants New Process Steel, L.P., New Process Steel, LP LLC, and New Process Steel Corporation of Illinois (collectively "NPS") are vicariously liable under Alabama law for Woodfin's torts, negligently and wantonly supervised Woodfin in violation of Alabama law, and subjected

Stancombe to a hostile work environment and constructively discharged him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. *Id*.

Defendants now move for summary judgment. Doc. 22. As the court will fully explain below, summary judgment is proper with respect to the Title VII claims because Stancombe has not established that Woodfin's harassing conduct rises to the required severe or pervasive level, or that NPS extracted Stancombe's resignation. Summary judgment is also due with respect to all of the state law claims against NPS. Finally, summary judgment is due as to the tort of outrage and invasion of privacy claims against Woodfin, and denied as to the assault and battery claim.

## I. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. FACTUAL BACKGROUND

This action arises from two episodes of alleged sexually inappropriate conduct. As a temporary placement through temp agency Personnel Staffing, Inc., Stancombe worked at NPS's steel processing facility as a "banding line" worker beginning in January 2012.  Doc. 22-1 at 3-4. The alleged harasser, Woodfin, also worked at NPS as a crane operator. *Id*. at 4.

The first alleged incident occurred on February 9, 2012 after Stancombe retrieved a piece of steel for his supervisor, Joe Young, Jr. Doc. 26-17 at 2. According to Stancombe, Woodfin approached Stancombe, gave him a "really deep bear hug," said "good job, good job," "dropped his hand down like he was letting go" and "grabbed [Stancombe's] butt." Doc. 22-1 at 9, 48. Woodfin purportedly repeated this sequence two more times—saying "good job, good job" while giving Stancombe a hug, then dropping his hand down and grabbing Stancombe's buttocks. *Id*. Stancombe told Woodfin to stop and soon thereafter reported the incident to his supervisors, Young and Doug Logan. *See* docs. 26-2 at 4; 26-17 at 2. In response, Logan took written statements from Stancombe and Woodfin, moved Stancombe to a different department to separate him from Woodfin, instructed Woodfin to "not have any contact with . . . Stancombe," and proceeded with an investigation of the incident by interviewing other employees. Docs. 22-1 at 67; 26-2 at 4. Logan also told Stancombe that starting the following

Monday, February 13, 2012, NPS would assign Stancombe to a different shift than Woodfin. Doc. 22-1 at 18.

In the meantime, when Stancombe returned to work the day after the first incident, he learned from Young that he had the option of signing up to work a Saturday shift the next day if "he still wanted that overtime that [he had] been asking for," and indeed Stancombe voluntarily signed up to work the Saturday shift. Doc. 22-1 at 56. Unbeknownst to Stancombe, Woodfin had also volunteered for the Saturday shift. *Id*. This Saturday shift was the scene of the second incident of allegedly sexually inappropriate conduct. Purportedly, while Stancombe was kneeling over to complete a task, Woodfin walked up to Stancombe, "grabbed [him] by the back of the head . . . and did . . . pelvic thrusting" motions three times against Stancombe's body for three to four seconds. *Id*. at 60. In shock and "livid about the situation," Stancombe "angrily stormed out" immediately and quit his job without reporting the incident to anyone at NPS. *Id*. at 15. NPS only learned about the incident when it received a letter from Personnel Staffing the next work day stating that Woodfin "grabbed [Stancombe's] head and made pelvic thrusts [three] times." Doc. 26-1 at 2.

Upon receiving the letter, NPS's Human Resources Administrator Renee Richardson (who was on vacation the prior week) launched an investigation. Doc. 22-4 at 1. Ultimately, with respect to the first incident, Richardson concluded that

Stancombe "was the initiator of the physical contact." Doc. 22-4 at 5. Apparently, because no other employees corroborated Stancombe's account of the first incident, Richardson chose to accept Woodfin's account that Stancombe initiated the physical touching when he "was up against" Woodfin "messing with him." *Id.* Notwithstanding Richardson's finding, NPS concluded that Woodfin's actions constituted "physical contact . . . inappropriate in the workplace" and suspended Woodfin for three days. *Id.* at 4. As to the second incident, however, NPS took no disciplinary action against Woodfin because Richardson concluded "there could not have possibly been any contact between" Stancombe and Woodfin. *Id.* at 5. Again, Richardson reached this conclusion based on Woodfin's account denying the harassing conduct and because no employees corroborated Stancombe's allegations. *Id.*

### III. ANALYSIS

NPS and Woodfin maintain that summary judgment is appropriate with respect to all claims. The court addresses each claim in turn, beginning first with the Title VII claims and then turning to the state law claims.

### A. Title VII hostile work environment and constructive discharge

NPS contends that Stancombe cannot establish the "severe or pervasive" element of the *prima facie* hostile work environment case. NPS also contends that the constructive discharge claim fails because Stancombe did not provide NPS

with sufficient opportunity to address his complaints. The court agrees with these contentions.

### 1. The alleged conduct failed to create a hostile work environment

To establish a hostile work environment claim, Stancombe must show: (1) that he belongs to a protected group; (2) that he was subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was based on his sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis exists for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). Relevant here, as to the "severe or pervasive" element, it is well-established that a plaintiff must show that he subjectively perceived the harassment as sufficiently severe or pervasive "to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id*. at 1246; *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (courts must "proceed with common sense and an appropriate sensitivity to social context, to distinguish between general office vulgarity and the conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive") (citation, alterations, and internal quotations omitted). Significantly, the objective component of this inquiry is fact

intensive and requires a showing as to "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246 (citations omitted).

Based on the record before this court, Stancombe cannot establish any of the four elements necessary to sustain the "severe or pervasive" prong of the *prima facie* case. First, while inappropriate, the two infractions here over the course of one month do not meet the frequency level necessary to satisfy the frequency component. *See Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 807 (11th Cir. 2012) ("a few dozen comments or actions . . . spread out over a period of eleven months," are insufficient); *Reeves*, 594 F.3d at 804 (frequency level met where the conduct occurred on a daily basis for over three years); *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (harassing conduct sufficiently frequent where it occurred "three or four times a day" for one month); *Dees v. Johnson Controls World Services, Inc.,* 168 F.3d 417, 418 (11th Cir. 1999) ("almost-daily abuse" over the course of three years was sufficiently frequent). Second, as to the severity of the alleged conduct, Stancombe failed to establish "a workplace that is permeated with discriminatory intimidation, ridicule and insult." Miller, 277 F.3d at 1267-77. In fact, Stancombe's allegations are somewhat similar

to those in *Guthrie*, where the harasser "grabbed Guthrie 'on [her] butt' two to five times," and made vulgar and sexually explicit comments to her on several occasions. *Guthrie*, 460 F. App'x at 804, and in which the Eleventh Circuit concluded that the comments and actions "were rude and boorish . . . [but] [fell] well short of conduct so severe as to 'alter or change the terms of . . . working conditions,' as determined by [Eleventh Circuit] case law," *id*. at 807. Likewise, the conduct in question here—Woodfin hugging Stancombe, grabbing his buttocks and saying "good job" in one incident and making sexually explicit pelvic thrusting motions in the second incident—is not so objectively severe as to alter the terms of Stancombe's work environment.[1] *See id*; *Dar Dar v. Associated Outdoor Club, Inc.*, 248 F. App'x 82, 85 (11th Cir. 2007) ("two sexually

_____

[1] Stancombe relies on evidence of inappropriate conduct that Woodfin allegedly directed toward another male employee to show that Woodfin's actions "altered the conditions of Stancombe's working environment and the working environment of all male employees at NPS." Doc. 27 at 25-26. This contention is unavailing because the alleged incident occurred years before Stancombe began working at NPS. *See* doc. 26-13 at 2. As such, Stancombe cannot rely on it to support his claim. *See Melton v. Nat'l Dairy LLC*, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (concluding that plaintiffs could not rely on incidents of harassing conduct that occurred prior to their start dates with the employer).

Moreover, where a plaintiff is relying on actions or statements toward other employees, he must present sufficient "information as to when the statements were made, how knowledge of them was acquired, and when [he] was informed of them (if [he] was)." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995). Here, while Stancombe knew that NPS had suspended Woodfin once prior to Stancombe's employment for "some kind of incident or something," his testimony on the subject is that he learned that Woodfin "was rubbing his butt" against another male employee, but cautioned that "it was secondhand" information, and he "didn't know how [the incident] transpired." Doc. 22-1 at 73. Even if this is sufficient information, the court finds this isolated incident is not the sort that leads to the conclusion that Woodfin views men "negatively, and in a humiliating and degrading way." *See Reeves*, 594 F.3d at 811.

inappropriate comments and two incidents of intentional buttocks touching" are not sufficiently severe).

Third, the alleged conduct is not objectively "physically threatening and humiliating" as compared to Eleventh Circuit precedent (for example, the conduct in *Reeves* and *Miller*). *See e.g.*, *Reeves*, 594 F.3d at 811-12; *Miller*, 277 F.3d at 1277. Finally, Stancombe has made no showing that the conduct "unreasonably interfered" with his work performance. In fact, Stancombe returned to work for the rest of the day after the first incident, as well as on the next day—apparently with no incident with Woodfin—and volunteered to work the Saturday shift, just two days after the first incident. While Stancombe stormed out after the second incident and that incident arguably "unreasonably interfered" with Stancombe's job performance that day, *see Miller*, 277 F.3d at 1277 (finding interference with plaintiff's job performance where harassing conduct "prevented [plaintiff] from performing his job, on at least one occasion"), this one episode is not sufficient to overcome Stancombe's failure to meet the other elements for the objectively severe and pervasive inquiry. Accordingly, because Stancombe has not presented a case of "severe or pervasive" harassment, summary judgment is due.[2]

---

[2] Alternatively, even if the alleged conduct is severe or pervasive, summary judgment is still warranted because an employer can only be liable if it "failed to take prompt remedial action after receiving notice of the alleged sexual harassment." *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). Here, NPS promptly investigated the allegations by interviewing Stancombe, Woodfin, and other employees within a few days (Logan began investigating on February 9 and Richardson began investigating on February 13). The only

### 2.  *The alleged conduct fails to support a constructive discharge claim*

In this Circuit, a court will presume that a resignation is voluntary unless the employee "comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir. 1995). It seems that Stancombe is attempting to establish the "involuntary extracted" element through his contention that "NPS would have made a finding, as it ultimately did, that there was no validation of Stancombe's" allegations, and Stancombe's assumption is that NPS would have never remedied the situation. Doc. 27 at 28. To the extent Stancombe is suggesting the decision to not credit his allegations establishes that NPS involuntarily extracted the resignation, the court rejects the contention because it is the employee's obligation in such instances "not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir. 1987). Significantly, "constructive discharge will generally not be found if the employer

---

interview missing is Stancombe's account of the second incident—because Stancombe resigned and did not return to NPS to report the incident—but the February 13 letter from Personnel Staffing to NPS recounted the second incident in detail. *See* doc. 26-1 at 2. Ultimately, even though no witnesses corroborated Stancombe's allegations, within two weeks of the first incident, NPS suspended Woodfin for three days and warned him that NPS does not tolerate the inappropriate conduct in question. Doc. 22-4 at 4. These remedial actions are sufficient to defeat a claim that NPS is liable for the alleged harassment. *See Kilgore*, 93 F.3d at 754 (remedial actions sufficient where employer conducted investigation within a few days, interviewed the parties and other employees, and no witnesses corroborated victim's allegations); *see also Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1305 (11th Cir. 2007) ("[W]arnings and counseling of the harasser are enough where the allegations are substantiated.").

is not given sufficient time to remedy the situation." *Kilgore*, 93 F.3d at 754. This is precisely the case here, where the record shows that, immediately after the first incident, NPS separated Stancombe and Woodfin and told Stancombe that he would work a new shift beginning on February 13 so that he would no longer have to work with Woodfin. Unfortunately, Stancombe quit on February 11 (albeit because of a second infraction), and never gave NPS's plan time to take effect. While Stancombe may feel the second incident warranted his resignation, the fact remains that, prior to Stancombe's resignation, "[n]othing about [NPS's] handling of [Stancombe's] accusation would have compelled a reasonable person to resign." *See Russell v. Sealing Equip. Products Co.*, No. 2:11-CV-04330-RDP, 2013 WL 6145333, at *8 (N.D. Ala. Nov. 20, 2013) ("Neither life nor the law favor quitters—particularly quitters who do not give their employer a chance to remedy the perceived wrong."). Accordingly, Stancombe's resignation before NPS could finish its investigation and schedule him to a new shift defeats Stancombe's constructive discharge claim.

For the reasons above, summary judgment is proper with respect to Stancombe's Title VII hostile work environment and constructive discharge claims against NPS.

### B.  State Law tort claims

Stancombe alleges state law tort of outrage, invasion of privacy, and assault and battery claims against Woodfin and NPS, and a negligent and wanton supervision claim against NPS. For the reasons stated below, except for the assault and battery claim against Woodfin, summary judgment is due on all of Stancombe's state law claims.

#### 1.  Tort of outrage claim against Woodfin

Outrage claims in Alabama are reserved for conduct so "outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Tinker v. Beasley,* 429 F.3d 1324, 1329-30 (11th Cir. 2005) (citing *American Rd. Svc. Co. v. Inmon,* 394 So. 2d 361, 365 (Ala. 1980)). Significantly, the Alabama Supreme Court has applied the *Inmon* test rather strictly, only recognizing the tort of outrage in three areas: wrongful conduct in the family burial context, insurance agents coercing settlement of insurance claims, extremely egregious sexual harassment, and a physician having a sexual relationship with a teenage patient in exchange for narcotics. *See O'Rear v. B.H.*, 69 So. 3d 106, 119 (Ala. 2011); *Ex parte Crawford & Co.,* 693 So. 2d 458, 460 n. 1 (Ala. 1997). Moreover, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to create liability for outrage; instead, "plaintiffs must necessarily be

expected and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind." *Surrency v. Harbison,* 489 So. 2d 1097, 1105-06 (Ala. 1986) (*quoting* Restatement (Second) of Torts, § 46, Comment (d) (1965)). Under this stringent standard, the court concludes that the alleged conduct here is not so severe and egregious (as further explained above) and therefore does not amount to an outrage claim. *See e.g.*, *Branch v. Arby's Rest. Grp., Inc.*, No. 2:12-CV-00677-HGD, 2013 WL 3153474, at *2, *7 (N.D. Ala. June 14, 2013) (no outrage claim where harasser grabbed victim's "left arm and attempted to unzip her jacket . . . ran his finger down the front of her shirt and told her, 'You are too beautiful. You need to let all this out'"); *Miller v. Home Depot USA Inc.*, 2013 WL 987941, at *3 (N.D. Ala. March 11, 2013) (harassment based on skin color, gender and national origin which "are indeed inappropriate in the workplace and have no place in civilized society" nonetheless are not "beyond all possible bounds of decency" to sustain outrage claim). Accordingly, summary judgment is due with respect to the outrage claim.

2. *Invasion of privacy claim against Woodfin*

Summary judgment is also due as to the invasion of privacy claim against Woodfin. Alabama law defines the tort of invasion of privacy as "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities."

*McIsaac v. WZEW–FM Corp.,* 495 So. 2d 649, 651 (Ala. 1986). However, the Alabama Supreme Court has noted that "[e]ven the dire affront of inviting an unwilling [person] to illicit intercourse has been held by most courts to be no such outrage as to lead to liability" for invasion of privacy. *Id.* at 652 (citing *Logan v. Sears, Roebuck & Co.,* 466 So. 2d 121, 124 (Ala. 1985); W. Prosser, *Law of Torts,* 54–55 (4th ed. 1971)). Additionally, as this court has previously explained, "Alabama courts have generally required invasion of privacy claims to allege both ongoing, persistent verbal harassment and unwanted physical contact." *Austin v. Mac-Lean Fogg Co.*, 999 F. Supp. 2d 1254, 1258 (N.D. Ala. 2014); *see, e.g.*, *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (invasion of privacy claim sustained when the plaintiff presented evidence that the defendant repeatedly touched her in a manner that was unwelcome and with sexual overtones, "made several lewd comments[,] asked [the plaintiff] to meet him outside of work for other than business purposes [,] . . . [and] looked up [the plaintiff's] skirt on more than one occasion"); *Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 711 (Ala. 1983) (invasion of privacy claim sustained when the plaintiff testified that the defendant called her into his office, locked the door, and interrogated her about her sexual relationship with her husband, repeatedly demanded sexual favors from her, reacted violently when she refused, "[o]n one occasion struck her across the buttocks with his hand[, and on] still another

occasion, . . . began papering his office window, thus obscuring the view of those in the surrounding area, in pursuit of what he hoped would be the consummation of lurid propositions to [the p]laintiff"); *Cunningham v. Dabbs,* 703 So. 2d 979, 980-81, 982 (Ala. Civ. App. 1997) (a reasonable jury could conclude the defendant intruded on the plaintiff's privacy when the defendant "frequently rubbed [the plaintiff's] shoulders and repeatedly made lewd and suggestive comments to her, including suggestions that they have sex" and on one occasion "leaned over her as if he were going to whisper something to her and stuck his tongue in her ear"). Guided by these cases, the court finds the alleged conduct by Woodfin is not so ongoing and persistent so as to sustain the invasion of privacy claim.

### 3. Assault and Battery claim against Woodfin

The court reaches a different conclusion with respect to the assault and battery claim against Woodfin. Under Alabama law, "an assault consists of 'an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'" *Peterson v. BMI Refractories*, 132 F.3d 1405, 1412-13 (11th Cir. 1998) (quoting *Allen v. Walker,* 569 So. 2d 350, 351 (Ala. 1990) (citations omitted)). A battery is defined as "a successful assault"—i.e., "an injury actually done to the person of another in an

angry or revengeful or rude or insolent manner." *Surrency*, 489 So. 2d at 1104 (citations omitted). Moreover, "to lay hands on another in a hostile manner is a battery, although no damage follows." *Id*. (citation and emphasis omitted). In the sexual harassment context, the Alabama Supreme Court has allowed an assault and battery claim to proceed where the defendant intentionally touched the plaintiff in a sexually suggestive manner, and where the touching was unwelcome. *See Ex Parte Atmore Community Hosp.,* 719 So. 2d at 1194 (defendant "touched [plaintiff's] waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg . . . [and] that each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome"). Accepting Stancombe's account as true, Woodfin's actions here were indeed intentional, unwelcome, and conducted with sexual overtones. *See Livingston v. Marion Bank & Trust Co.*, No. 2:11-CV-1369-LSC, 2014 WL 3347910 at *1323 (N.D. Ala. July 8, 2014). Accordingly, summary judgment is due to be denied with respect to the assault and battery claim.

### 4. *State law claims against NPS*

The court turns now to the state law claims against NPS, addressing first the issue of NPS's vicarious liability for Woodfin's torts and second, the negligent and wanton supervision claim.

i.   <u>Vicarious liability</u>

As an initial matter, NPS cannot be vicariously liable for the outrage or invasion of privacy claims because, as outlined above, the court finds that those underlying claims fail. *See Speigner v. Shoal Creek Drummond Mine*, 402 F. App'x 428, 432 (11th Cir. 2010) (employer "simply cannot be held liable for authorizing or ratifying conduct that . . . did not occur") (citing *Potts v. BE & K Constr. Co.*, 604 So. 2d 398 (Ala. 1992)). With respect to the assault and battery, NPS can be liable under Alabama law only if Stancombe establishes that: "(1) [Woodfin's] wrongful acts were in the line and scope of his employment; or (2) that the acts were in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts." *Potts*, 604 So. 2d at 400 (quotation marks, alterations, and citation omitted). The parties generally agree that the relevant inquiry in this case is whether NPS "ratified the wrongful acts" of Woodfin. For Stancombe's claim to survive under this theory, he must present sufficient evidence that NPS: "(1) had actual knowledge of the tortious conduct of [Woodfin] and that the tortious conduct was directed at and visited upon [Stancombe]; (2) that based on this knowledge, [NPS] knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that [NPS] failed to take adequate steps to remedy the situation." *Id*.

Stancombe cannot meet this burden because the undisputed record evidence establishes that NPS took adequate steps that were "reasonably calculated to stop [the tortious] conduct." *Id.* at 401. Specifically, Stancombe's supervisor, Logan, promptly interviewed Stancombe and Woodfin, told Woodfin to "not have any contact with . . . Stancombe," moved Woodfin and Stancombe to different departments, and planned to schedule them to different shifts beginning the following Monday. Docs. 22-1 at 67; 26-2 at 4. Furthermore, after completing the investigation into the first incident—albeit after the second incident—NPS suspended Woodfin for three days, counseled him that the alleged conduct violated NPS's policies, and required him to submit to a six-hour "counseling class" because of his behavior. Docs. 22-2 at 84; 22-3 at 12. As the Eleventh Circuit has held, an employer takes "adequate steps to remedy the situation by investigating the claim, counseling [the harasser] to avoid such conduct in the future, and arranging for [victim] to work under a different supervisor." *Speigner*, 402 F. App'x at 432. Based on the undisputed evidence before this court, NPS is not liable for the assault and battery because it took reasonable steps to address Stancombe's complaints.[3] *See id.* Therefore, summary judgment is due with respect to the assault and battery claim against NPS.

---

[3] Stancombe testified that he believed NPS mishandled the situation because he "would have liked some kind of assurance that until [NPS] concluded their investigation," he and Woodfin "wouldn't be anywhere around one another even in passing, or at least [that NPS would

### ii. Negligent and wanton supervision

Under Alabama law, "[t]o recover on negligent supervision . . . claims against an employer, a plaintiff must establish by affirmative proof that the employer actually knew of the incompetence of the employee, or that the employer reasonably should have known of it." *Speigner*, 402 F. App'x at 433 (citing *Southland Bank v. A & A Drywall Supply Co.*, 21 So. 3d 1196, 1215-16 (Ala. 2008); *Pritchett v. ICN Med. Alliance, Inc.*, 938 So. 2d 933, 940 (Ala. 2006)) (internal quotation marks and alterations omitted). The plaintiff must also show that the employer failed to exercise "due care" in handling the incompetency. *See Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1004 (Ala. 1993). Similarly, "a claim for wanton supervision requires . . . affirmative proof that the employer actually knew of the employee's incompetence or reasonably should have known of it" and that the employer "wantonly disregarded the [employee's] incompetence." *Speigner*, 402 F. App'x at 433 (citing *Armstrong Bus. Servs., Inc. v. AmSouth Bank,* 817 So. 2d 665, 682 (Ala. 2001). Further, Alabama law defines "wanton" conduct as that "which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20. In the sexual harassment context, the Alabama Supreme Court has explained that a plaintiff alleging wanton

---

have let Stancombe] stay home until [the investigation] was concluded . . . so that there wouldn't be an opportunity for the second incident." Doc. 22-1 at 67. The court finds no legal authority supporting Stancombe's position or otherwise suggesting that NPS's mishandled the situation. Ultimately, as explained above, the court concludes that NPS took adequate steps to prevent future tortious conduct. *See Speigner*, 402 F. App'x at 432.

supervision must show that the employer "made a conscious decision to downplay the sexual harassment complaint . . . knowing that to do so would likely result in [the harasser] mistreating a[n] . . . employee." *Big B, Inc.*, 634 So. 2d at 1004.

The record here is undisputed that NPS had the requisite knowledge of Woodfin's behavior. Indeed, Stancombe notified Young and Logan of Woodfin's alleged actions immediately after the first incident, and NPS's own personnel documents demonstrate that NPS disciplined Woodfin in 2007 for inappropriately touching another employee. Doc. 22-2 at 83. Still, following Eleventh Circuit guidance in *Speigner*, the remedial actions NPS implemented are sufficient for it to defeat the negligence and wantonness claims. In reaching this decision, the court notes that NPS disciplined Woodfin even though he denied Stancombe's allegations and no NPS employee corroborated Stancombe's allegations, and that the remedial actions NPS took are similar to the facts that the court in *Spiegner* relied on in finding the employer did not act negligently or in wanton disregard. *See Speigner*, 402 F. App'x at 433 (negligence and wantonness claims failed in part because harasser received anti-harassment training, denied the allegations of harassment, and there were no witnesses to confirm the allegations). The court notes also that NPS counseled Woodfin about his past conduct—which occurred

five years prior to the incident with Stancombe—and also suspended him.[4] Doc. 22-2 at 83. Basically, based on the record before this court, Stancombe has presented no evidence to establish that NPS failed to exercise due care in handling Stancombe's complaint or other complaints against Woodfin—let alone that NPS made a "conscious decision to downplay" Woodfin's conduct. *See Big B, Inc.*, 634 So. 2d at 1004 (employer handled the matter negligently and wantonly where it never trained the harasser on the relevant harassing conduct, did not interview the victim who alleged harassment, and did not produce a formal report of the matter). Accordingly, summary judgment is also due as to the negligent and wanton supervision claims.[5]

---

[4] Stancombe points to an incident in November 2012 where NPS suspended Woodfin for "disorderly conduct" after Woodfin followed a male coworker, Sylvester Jones, to the bathroom and asked to see the "cut" on Jones's finger. Doc. 26-13 at 2. Apparently, Jones had "cut his finger while cleaning the bathroom." *Id.* After investigating the incident, NPS concluded that Woodfin's conduct "disrupted productivity," required Woodfin to undergo training regarding NPS policies, and notified him that any additional violations of NPS policy would lead to his termination. *Id.* To the extent Stancombe is characterizing this incident as one involving sexual harassment, the court finds no support for such a characterization.

[5] Summary judgment on the negligent supervision claim is also due because Stancombe's only damages are "emotional distress" from the "very traumatic and alarming" encounters with Woodfin. Doc. 27 at 16. Alabama law is clear that "[d]amages for mental anguish are not recoverable for negligence except when the plaintiff has suffered physical injury as a result of the negligent conduct or was placed in an immediate risk of physical injury by the conduct." *Lindsey v. NCO Fin. Sys., Inc.*, No. 2:11-CV-03183-WMA, 2012 WL 3999870, at *3 (N.D. Ala. Sept. 12, 2012) (citing *Brown v. First Fed. Bank*, 95 So. 3d 803, 818 (Ala. Civ. App. 2012)). While Stancombe testified to experiencing marital problems, difficulty sleeping, and "intimacy" problems, doc. 22-1 at 69, the court finds no evidence of physical injury to Stancombe resulting from the emotional distress.

## IV. CONCLUSION

For the reasons stated above, the motion for summary judgment is due with respect to the hostile work environment and constructive discharge claims against NPS. As to the state law tort claims, the motion is due to be granted with respect to the tort of outrage claims and invasion of privacy claims against both NPS and Woodfin. Finally, with respect to the assault and battery claims, the motion is due to be denied as to the claim against Woodfin and granted as to the claim against NPS. The court will enter a separate order consistent with this opinion.

**DONE** the 9th day of April, 2015.


**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE